COOLEY LLP
MICHAEL A. ATTANASIO (151529)
(mattanasio@cooley.com)
JON F. CIESLAK (268951)
(jcieslak@cooley.com)
4401 Eastgate Mall
San Diego, CA  92121
Telephone:   (858) 550-6000
Facsimile:    (858) 550-6420

MICHAEL GORDNER LAW OFFICE, PLC
MICHAEL GORDNER (admitted pro hac vice)
(mgordnerlaw@gmail.com)
28900 Telegraph Road
Southfield, MI 48034
Telephone: (519) 254-1518
Facsimile: (519) 258-8755

Attorneys for Defendant
Nathan Jacobson

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States,<br><br>            Plaintiff,<br><br>       v.<br><br>Nathan Jacobson, et al.,<br><br>            Defendants. | Case No.  07-cr-2016-JLS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO WITHDRAW GUILTY PLEA**<br><br>Date:        February 7, 2014<br>Time:        1:30 PM<br>Judge:       Hon. Janis Sammartino<br>Court:       4D |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................ 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ................................... 2

        A.      Personal Background ................................................................. 2

        B.      Mr. Jacobson's Founding of Rx Payments ............................... 3

        C.      Mr. Jacobson Ensures that His Businesses Operate Lawfully ............ 4

        D.      Mr. Jacobson's Visit to Costa Rica in 2005 ............................ 6

        E.      Mr. Jacobson's Recorded Phone Calls in 2006 ....................... 6

        F.      Mr. Jacobson's Whistleblower Activities Prior to the Indictment ....... 8

        G.      Indictment ................................................................................ 9

        H.      Mr. Jacobson's Response to the Indictment ............................ 9

                1.      Mr. Jacobson Hires Counsel .......................................... 9

                2.      Mr. Jacobson Consistently Declares His Innocence ............... 10

                3.      Mr. Jacobson Is Unduly Pressured to Plead Guilty ................ 11

        I.      Mr. Jacobson Enters A Guilty Plea ........................................ 14

        J.      Mr. Jacobson Cooperates With the Government ..................... 14

        K.      Mr. Jacobson Is Abandoned by Counsel Prior to Sentencing ........... 14

III.    LEGAL STANDARD ....................................................................... 16

IV.     ARGUMENT .................................................................................. 16

        A.      Mr. Jacobson's Innocence Permits Withdrawal of His Plea ............. 17

                1.      Mr. Jacobson Has Repeatedly Maintained His Innocence ....... 18

                2.      There Is Substantial Evidence to Support Mr. Jacobson's
                        Innocence ..................................................................... 19

        B.      Mr. Jacobson Received Ineffective Assistance of Counsel ............. 20

                1.      Mr. Skurka Coerced Mr. Jacobson Into Pleading Guilty
                        and Did Not Properly Advise Him of His Chances at Trial ..... 21

                2.      Mr. Skurka Did Not Adequately Investigate Mr.
                        Jacobson's Case or Obtain Discovery ............................ 22

                3.      Mr. Skurka's Advice to Plead Guilty Was Based on His
                        Bias Against the United States Justice System ................ 24

V.      CONCLUSION ............................................................................... 25

Cooley LLP
Attorneys At Law
San Diego

ii.

Memo ISO Motion to
Withdraw Guilty Plea
07-cr-2016-JLS

# TABLE OF AUTHORITIES

Page(s)

CASES

*Michelson v. United States,*
   335 U.S. 469 (1948) ........................................................................................... 19, 20

*Strickland v. Washington,*
   466 U.S. 668 (1984) .................................................................................................. 22

*United States v. Artabane,*
   868 F. Supp. 76 (M.D. Penn. 1994) ......................................................................... 18

*United States v. Bonilla,*
   637 F.3d 980 (9th Cir. 2001) ............................................................................. 16, 21

*United States v. Clark,*
   931 F.2d 292 (5th Cir. 1991) .................................................................................... 17

*United States v. Davis,*
   428 F.3d 802 (9th Cir. 2005) ............................................................................. 16, 21

*United States v. Garcia-Espana*
   2007 WL 473777 (E.D. Wash. Feb. 8, 2007) ..................................................... 22, 23

*United States v. Hiett,*
   220 Fed App'x 638 (9th Cir. 2007) .......................................................................... 21

*United States v. Kroening,*
   15 F.3d 1092 (9th Cir. 1993) .................................................................................... 17

*United States v. Loughery,*
   908 F.2d 1014 (D.C. Cir. 1990) ............................................................................... 22

*United States v. Ludwig,*
   972 F. 2d 948 (8th Cir. 1992) ................................................................................... 17

*United States v. Marbella,*
   73 F.3d 1508 (9th Cir. 1996) .................................................................................... 17

*United States v. Mayweather,*
   634 F.3d 498 (9th Cir. 2010) .................................................................................... 16

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iii.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. McTiernan*,
    546 F.3d 1160 (9th Cir. 2008)..........................................................2, 16, 17, 21

*United States v. Mitchell*,
    2009 WL 603198 (D. Utah. March 9, 2009)..............................................21, 22

*United States v. Newbert*,
    471 F. Supp. 2d 182 (D. Me. 2007)............................................................16, 20

*United States v. Richards*,
    1998 WL 667455 (9th Cir. Sept. 14, 1998)......................................................16

*United States v. Robinson*,
    498 F. Supp. 2d 328 (D.D.C. 2007) ..........................................................passim

*United States v. Rogers*,
    289 F. Supp. 726 (D. Conn. 1968) .......................................................18, 22, 23

*United States. v. Showalter*,
    569 F.3d 1150 (9th Cir. 2009) ........................................................................16

*United States v. Signori*,
    844 F.2d 635 (9th Cir. 1988) ..........................................................................16

*United States v. Yarbrough*,
    527 F.3d 1092 (10th Cir. 2008)..................................................................19, 20

**STATUTES**

18 U.S.C. § 1956.................................................................................................17

21 U.S.C. § 331(k)........................................................................................24, 25

**OTHER AUTHORITIES**

Federal Rule of Criminal Procedure
    11 ......................................................................................................................1

    11(d)(2)(B)..........................................................................................2, 16, 17, 20

Federal Rule of Evidence
    404(a)(2) ..........................................................................................................20

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iv.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

# I.   INTRODUCTION

Nathan Jacobson pled guilty not because he was guilty, but rather because of the ineffective legal advice he received from his lead counsel.  Mr. Jacobson's guilty plea should be set aside and he should be permitted to stand trial.

This case is about an organization – the "Affpower Enterprise" – that used the Internet to distribute and dispense prescription pharmaceuticals.  Mr. Jacobson was not employed by Affpower, did not direct its activities, and was not involved in the procurement, sale, or distribution of prescription drugs.  What Mr. Jacobson's company is alleged to have done is facilitate payment for those drugs by processing routine credit card transactions.  Mr. Jacobson will establish his innocence with substantial evidence that he did not know that Affpower was involved in allegedly illegal activity, nor did he knowingly process payments for illegal transactions.

When the indictment was returned, Mr. Jacobson – defendant number 18 of the 18 charged defendants – retained a Canadian lawyer named Steven Skurka to defend him.  Mr. Skurka was not admitted to, nor had he ever tried a case in, any court in the United States.  He did, however, harbor a well-documented bias against the United States justice system, which he publicly described as a "tyrannical" regime in which even an innocent defendant is unable to obtain a fair trial.

Mr. Skurka failed to provide effective assistance of counsel to Mr. Jacobson.  Mr. Skurka neither obtained discovery nor properly evaluated Mr. Jacobson's defenses.  Instead, Mr. Skurka ignored Mr. Jacobson's protestations of innocence and pressured him to plead guilty to a single count of money laundering.  The alternative?  Mr. Jacobson would be "crushed like a walnut" by the government and receive decades in prison.  Because of this flawed advice, Mr. Jacobson pled guilty before the Honorable Irma E. Gonzalez, admitting to a crime he did not commit.[1]

---

[1] This Motion does not challenge the conduct of the plea hearing by Judge Gonzalez.  The plea colloquy was sufficient under the Constitution and under the relevant provisions of Rule 11.  Mr. Jacobson followed Mr. Skurka's instructions to respond "yes" to every question posed by Judge Gonzalez about his purported guilt.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

Mr. Jacobson need only show a "fair and just reason" for withdrawal of his plea. Fed. R. Crim. Proc. 11(d)(2)(B). The Ninth Circuit has made clear that this standard is "generous and must be applied liberally." *United States v. McTiernan*, 546 F.3d 1160, 1167 (9th Cir. 2008). To satisfy this standard, Mr. Jacobson need only put forth some "objectively reasonable argument" that he is innocent. *See United States v. Robinson*, 498 F. Supp. 2d 328, 336 (D.D.C. 2007). Mr. Jacobson easily meets this standard.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Personal Background

Mr. Jacobson is well known in Canada and Israel as a businessman and philanthropist. He was born and raised in modest circumstances in Winnipeg, Canada. (Declaration of Nathan Jacobson ("Jacobson Decl.") ¶ 2.) Upon finishing high school in 1973, he traveled to Israel shortly before the Yom Kippur War broke out. (*Id.* ¶¶ 2-3.) After volunteering in support of the Israeli army during the War, he remained in Israel to join the army. (*Id.* ¶¶ 3-4.) He served honorably for six years, rising to the rank of Captain. (*Id.* ¶ 4.) He then returned to Canada to start his business career. (*Id.* ¶ 5.) While working in Toronto in 1989, Mr. Jacobson met his wife Lindi Bjornstad. (*Id.* ¶ 6.) In 2003, they adopted an 18-month old girl from the Ukraine. (*Id.*) Their daughter, Katya, is now 12 years old. (*Id.*) Mr. Jacobson and his family live in Toronto, where his daughter attends school.[2] (*Id.*)

Mr. Jacobson has never been charged or convicted of any criminal offense except for the one-count plea at issue in this motion. (*Id.* ¶ 1.) Over the years, he has done extensive charitable work. (*Id.* ¶ 7.) He has made substantial contributions to dozens of charities in Canada, Israel, and the United States, and has served on numerous boards, including Tel Aviv University's. (*Id.*) He has also

---

[2] Mr. Jacobson is currently staying in downtown San Diego under the terms of his release on bail. His bail was secured by several sureties who pledged cash or property. These included family members, friends, and a retired United States Special Forces Officer who knew Mr. Jacobson professionally and personally while serving in Tel Aviv.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

2.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

provided services and information, some of it classified, to government agencies in the United States, Canada, and Israel, frequently acting as a liaison between officials in these and other countries.  (*Id.* ¶ 24.)

### B.   Mr. Jacobson's Founding of Rx Payments

After his military service, Mr. Jacobson began his career with a subsidiary of IBM based in Toronto.  (Jacobson Decl. ¶ 5.)  He eventually became the Vice President of Computer Integrated Manufacturing for IBM in Toronto, a position he held for several years.  (*Id.*)

In the early 2000s, Mr. Jacobson pursued a new business opportunity.  For many years, United States consumers living near the Canadian border had been traveling to Canada to purchase lower cost prescription drugs from Canadian pharmacies. As the Internet grew, mail order pharmacies in Canada made it possible for consumers throughout the United States to have similar access to lower cost prescription drugs.  Mr. Jacobson learned that pharmacies in Canada offering mail order services needed access to merchant account services to process credit card transactions.  (Jacobson Decl. ¶ 8.)  Mr. Jacobson was approached by a business acquaintance named James McRoberts about developing an online payment processing company to meet this demand.  (*Id.*)  Mr. Jacobson decided to invest in and become the owner of the new company, which began operating under the names Rx Payments Ltd. and Paygea Ltd. (collectively "Rx Payments").  (*Id.*)

Mr. Jacobson was not involved in the day-to-day operations of Rx Payments.  (*Id.* ¶ 9.)  Instead, Rx Payments was operated and managed by Mr. McRoberts.  (*Id.*)  In addition, Howard Klein served as the compliance and risk officer for the companies.  (*Id.*)  Mr. Klein was a seasoned e-commerce risk manager, and was responsible for ensuring that Rx Payments was dealing only with legitimate companies.  (*Id.*; Ex. A (Klein's credentials)[3].)

---

[3] All Exhibits are attached to the Notice of Lodgment filed concurrently with this motion.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

3.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

### C.    Mr. Jacobson Ensures that His Businesses Operate Lawfully

Mr. Jacobson was never a rogue operator within the industry.  To the contrary, he maintained at all times rigorous ethical standards for his companies, even in an industry marked by constant evolution, patchwork laws across several countries, and the presence of some online merchants who were very skilled at masking their illegal activities.

To help his companies understand the regulatory scheme controlling Internet pharmacies, Mr. Jacobson solicited legal experts to educate Rx Payments. (Jacobson Decl. ¶ 10.)  He asked the general counsel of a trade association called the Canadian International Pharmacy Association ("CIPA"), John Myers, to provide an analysis of the international prescription services market and the role of service providers like Rx Payments.  (Ex. B.)  Rx Payments worked closely with CIPA.  (Jacobson Decl. ¶ 11.)  CIPA had developed a set of practice standards around the distance-based delivery of pharmaceutical products and services to augment existing provincial laws and regulations.  (Ex. C, Schedule A.)  Through its association with CIPA and careful attention to its business partners, Rx Payments encouraged high standards for online pharmacies in Canada.

Applying the principles established by CIPA, the process of becoming a customer of Rx Payments was rigorous.  (Jacobson Decl. ¶ 12.)  A prospective customer had to provide detailed information on its operations and related websites. (*Id.*; Exs. D, E.)  In addition, Rx Payments required an opinion letter from an attorney confirming facts regarding, among other things, the pharmacy's order management procedures, the types of agreements the pharmacy had with its customers, and how customers interacted with the pharmacy.  (Jacobson Decl. ¶ 12; *see, e.g.,* Exs. F, G.)  Each merchant that contracted with Rx Payments had to be approved by Visa and/or MasterCard.  (Jacobson Decl. ¶ 12.)  Rx Payments also required that every pharmacy have a customer agreement in place with each of its

Cooley LLP
Attorneys At Law
San Diego

4.

Memo ISO Motion to
Withdraw Guilty Plea
07-cr-2016-JLS

patients.  (*Id.*)  This agreement contained confirmations and authorizations designed to ensure that all pharmaceutical sales were legal.  (*See, e.g.*, Ex. H at 2.01(a)-(b).)

After accepting a pharmacy as a customer, Rx Payments continued to monitor its compliance.  For instance, Rx Payments placed test orders to ensure that none of its merchants were engaged in the practice of "ghosting" orders.  (Jacobson Decl. ¶ 13.)  In one case, Rx Payments learned that a pharmacy it was servicing had been suspended from membership in CIPA because it was filling orders for a product requiring a prescription, but the pharmacy was not obtaining a copy of the prescription in advance of shipping an order.  (*Id.* ¶ 14.)  When Rx Payments learned about this, it immediately cut off services to the pharmacy in question.  (*Id.*)

After these procedures and safeguards were instituted, Rx Payments added a new online pharmacy client named Aritexo, which employed a call center in Costa Rica called Berberry SA.  (Jacobson Decl. ¶ 15.)  This company was also known as Affpower.  (*Id.*)  Affpower underwent the same rigorous vetting process as Rx Payments' other clients.  (*Id.*)  The vetting was conducted by James McRoberts, who was responsible for Rx Payments' day-to-day operations, Howard Klein, the company's risk manager, and other employees.  (*Id.*)

Consistent with its procedures, Rx Payments obtained a legal opinion vouching for Affpower.  (*Id.* ¶ 16; Ex. I.)  As with all of Rx Payments' contracts, the terms of service between Affpower and Rx Payments stipulated that there could be no illegal processing.  (Jacobson Decl. ¶ 17.)  Mr. McRoberts, along with Mr. Klein and two other employees, traveled to Costa Rica to review the Affpower operations.  (*Id.* ¶ 18.)  Mr. McRoberts negotiated the contract with Affpower on Rx Payments' behalf, and handled the documentation for Affpower vis-à-vis approval by the processing banks and the credit card companies.  (*Id.* ¶ 15.)

Mr. Jacobson was not employed by Affpower, did not direct its affairs directly or indirectly, and had no role in its procurement and distribution of prescription pharmaceuticals.  (*Id.* ¶ 19.)  He did, however, understand from his

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

5.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

management team, and the processes put in place by Rx Payments, that Affpower operated a legitimate business based on valid medical prescriptions.  (*Id.* ¶ 20.)  In other words, Rx Payments and Mr. Jacobson were in no different position than the banks and credit card companies engaged with Affpower to process the company's financial transactions.  Under HIPAA, neither Rx Payments nor the banks and credit card companies had any ability to know anything about the patient's condition, the medication ordered, or the identity of the approving physician.  (*See* Declaration of Ron Allain ("Allain Decl.") ¶ 4.[4])

### D.    Mr. Jacobson's Visit to Costa Rica in 2005

Mr. Jacobson did not meet with individuals from Affpower himself until 2005, when he was in Costa Rica to meet with senior government officials on other business.  (Jacobson Decl. ¶ 21.)  Mr. McRoberts suggested that it would make good business sense for Mr. Jacobson to meet with David Glass, a principal of Affpower.  (*Id.*) Nothing during the meeting led Mr. Jacobson to believe that Affpower was operating illegally.  (*Id.*)  Indeed, because Affpower was using American doctors and American pharmacies to provide prescriptions to American patients, Mr. Jacobson understood their business model to be the "gold standard" for the industry.[5]  (*Id.* at ¶ 20.)

### E.    Mr. Jacobson's Recorded Phone Calls in 2006

In the summer of 2006, Mr. Jacobson spoke by telephone on two occasions to Mr. Glass.   Unbeknownst to Mr. Jacobson, Mr. Glass by this time was cooperating with law enforcement in an investigation of Affpower's business, and

---

[4]  Mr. Allain is a colleague of Mr. Jacobson's with significant experience in the industry.

[5]  The government concedes that Affpower "paid licensed doctors located across the United States" to issue prescriptions.  (ECF 1 (Indictment) at 2:18-20.)  To be sure, the government takes issue with the manner in which those doctors determined a patient's need for a particular medication, but Mr. Jacobson never knew that the "Affpower enterprise doctors," *id.* at 2:20, were not discharging their medical duties lawfully.

Cooley LLP
Attorneys At Law
San Diego

6.

Memo ISO Motion to
Withdraw Guilty Plea
07-cr-2016-JLS

1  he tape-recorded both conversations.  The recordings are exculpatory.  (*See* Exs.
2  J, K.)

3      During the first call, Mr. Glass repeatedly attempted to draw Mr. Jacobson
4  into an inculpatory conversation.  Mr. Glass vaguely referred to the nature of the
5  prescriptions obtained by Affpower customers, and he attempted to get Mr.
6  Jacobson to say that Mr. Jacobson knew there were irregularities with the
7  prescriptions.  Mr. Jacobson rejected Mr. Glass's characterizations, and steered the
8  conversation towards a legitimate discussion about the business risks presented if
9  Affpower was forced to wind down its business.  These included a potential
10  disconnect between orders fulfilled and payments made, as well as the risk of credit
11  card chargebacks.  Overall, Mr. Jacobson stated that he expected the business to run
12  properly, and that he was looking out for the employees.  (Ex. J at 68, 72.)  Mr.
13  Jacobson stressed the need for "real prescriptions."  (*Id.* at 78.)  In a passage that a
14  jury would surely appreciate, Mr. Jacobson emphasized to Mr. Glass:  ***You'll just***
15  ***have to make sure the business is cleaner than clean.***  (*Id.* at 82 (emphasis
16  added).)

17      At one point in the first call with Mr. Glass, Mr. Jacobson referred to "virtual
18  prescriptions," (*Id.* at 79), meaning a legal prescription that was issued
19  electronically rather than in hard copy.  (Jacobson Decl. ¶ 22.)  Mr. Allain, in his
20  declaration, explains that while he worked for Mr. Jacobson, the term "virtual
21  prescription" was used to refer to legitimate prescriptions scanned into a software
22  system for review in different locations. (Allain Decl. ¶¶ 2, 3.)  The term did not
23  imply bogus prescriptions.  (*Id.*)  This understanding is further corroborated by the
24  tape-recording itself, in which Mr. Glass twice responds unequivocally that
25  Affpower uses prescriptions signed by doctors. (Ex. J at 79 (Jacobson: "Is there a
26  doctor signed on each prescription?"  Glass: "Yeah, there's a doctor that signs on
27  it."); Ex. J at 80-81 (Jacobson:  "Are you sure that a doctor's issuing a
28  prescription?"  Glass: "Well yeah.").

Cooley LLP
Attorneys At Law
San Diego

7.

Memo ISO Motion to
Withdraw Guilty Plea
07-cr-2016-JLS

During the second call, Mr. Glass inveigles Mr. Jacobson to resume conducting business with Affpower and "help bail us out of the situation." (Ex. K at 86.) Mr. Jacobson refused to conduct any further business with Affpower, and advised Optimal Processing, Affpower's other payment processor, to do the same. (Jacobson Decl. ¶ 23.) At the time, he had no knowledge that Affpower was under federal criminal investigation. (*Id.*)

**F.    Mr. Jacobson's Whistleblower Activities Prior to the Indictment**

In addition to Mr. Jacobson's efforts to ensure his companies were acting legally, and his work with CIPA, he also worked closely with Costa Rican and United States officials to condemn and expose illegal Internet operations. (*Id.* at ¶ 25; Ex. L.) He provided information to United States authorities when he became aware of online pharmacies that were not complying with the law. (*Id.* at ¶ 26.) Mr. Jacobson provided extensive information to United States authorities well before he knew anything about the government's investigation into Affpower or himself.

Mr. Jacobson's cooperation with the government was extensive and continued over a number of months. Mr. Jacobson worked principally with DEA Special Agent Robert Polimeno, and FDA Special Agent Daniel Burke. (*Id.*) On December 28, 2006, Mr. Jacobson wrote to Agent Polimeno, advising him that Mr. Jacobson had been working with the government in Costa Rica to help "CR to become a 'Center of Excellence' in e-commerce by immediately stopping all the scam artists and those selling drugs, counterfeit drugs, etc. from there." (Ex. L.) He further stated that "[o]ur goal is also to clean the internet up and ensure that only clean and proper companies operate on it." (*Id.*)

As noted above, Mr. McRoberts and Mr. Klein were running Rx Payments' day-to-day operations at this time. They too were enlisted by Mr. Jacobson to aid the government. (*Id.* at ¶ 27.) Mr. Jacobson told Agent Polimeno that Mr. Klein's "knowledge of payment processing and all the bad elements that concern you and

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

8.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

1  us is very, very high." (Ex. M.)  At Mr. Jacobson's insistence, Mr. Klein and Mr.

2  McRoberts began providing information directly to Agent Polimeno.  (Exs. N, O.)

### G.    Indictment

Despite this cooperation, on July 27, 2007, Mr. Jacobson was indicted with seventeen other individuals on a 318-count Indictment regarding the illegal sale of prescription pharmaceuticals by Affpower.[6]  (ECF 1.)  Given the facts set forth above, Mr. Jacobson was stunned by his inclusion in the Affpower indictment.

The indictment broadly alleges that Affpower sold prescription drugs over the Internet to customers located throughout the United States who did not have proper prescriptions from personal physicians.  (*Id.* at p. 2.)  With respect to Rx Payments, the indictment alleges that Affpower contracted with Rx Payments, along with another foreign-based credit-card processing agency, to provide electronic credit card payment services.  (*Id.* at p. 6.)  Mr. Jacobson was indicted as the principal of Rx Payments.

### H.    Mr. Jacobson's Response to the Indictment

#### 1.    Mr. Jacobson Hires Counsel

Upon learning of the indictment, Mr. Jacobson hired a Canadian attorney named Steven Skurka to defend him.  (Jacobson Decl. ¶ 28.)  Mr. Skurka was not admitted to the bar in the United States and had never tried a case there.   Mr. Skurka also retained "local" counsel, a Los Angeles-based attorney named David Elden followed by a Chicago-based attorney named Patricia Holmes.  (*Id.* at ¶ 29.) Throughout, Mr. Skurka remained lead counsel, and was in complete control of the decision-making process.  (*Id.*)  Mr. Jacobson told Mr. Skurka that "my trust is totally in you." (Ex. P.)

---

[6] The case was indicted and prosecuted by the Computer Crime & Intellectual Property Section of the Criminal Division of the Department of Justice, not the U.S. Attorney's Office.  The latter office subsequently became more involved in the case, but not until well after Mr. Jacobson pled guilty.  The communications described in this motion involve federal prosecutors from Washington, D.C., not San Diego.

Cooley LLP
Attorneys At Law
San Diego

9.

Memo ISO Motion to
Withdraw Guilty Plea
07-cr-2016-JLS

In Canada, Mr. Skurka is known for his work as a media commentator on legal issues. He covered the criminal fraud trial of media tycoon Conrad Black, and ultimately wrote a book about the case. In the book, *Tilted*, Mr. Skurka opines that it is impossible to get a fair trial in the American justice system. (Ex. Q.) In the same language that he used repeatedly with Mr. Jacobson, Mr. Skurka bemoaned the unfairness of American judges and prosecutors. (*Id.*) He painted a hopeless picture for criminal defendants, warning that they could escape harsh punishment only by pleading and cooperating – never at trial.

- In the book's introduction, Mr. Skurka states: "For the cynical observers of the case, the outcome was perennially stacked in the prosecution's favour. The U.S. was a nation filled with pretend freedoms, and defeating the system was virtually impossible." (*Id.* at 104.)

- "The overwhelming culture created in the American justice system permits the prosecutors to punish defendants who exercise their rights to go to trial and reward the legion of defendants who accept responsibility, plead guilty, and most significantly, point fingers at others. Justice is effectively bartered in the prosecutor's office, not fought for in the courtroom." (*Id.* at 106.)

- "Ninety-five to ninety-seven percent of criminal cases end in guilty pleas that magnify the significance of the sentencing process . . . prosecutors just don't lose. That is the justice system in America. It is a 'tyrannical' system weighted heavily in favour of the prosecution." (*Id.* at 108.)

* * * * *

Throughout his representation of Mr. Jacobson, Mr. Skurka shared with his client his flawed view of American justice. (Jacobson Decl. ¶ 31.) Against this backdrop, he pressed Mr. Jacobson to plead guilty even as the latter expressed his innocence. (*Id.*)

## 2. Mr. Jacobson Consistently Declares His Innocence

On August 3, 2007, almost immediately following his first meeting with Mr.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

10.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

Skurka, Mr. Jacobson wrote to Mr. Skurka stating that he was "very confident that nothing that we did was illegal nor unethical."  (Ex. R.)   Mr. Jacobson also wrote privately to a number of others on that same day, stating in part:

> I have already discussed with the lawyer and we will respond proactively and aggressively. As there is no processor in the pharma industry that is as strict and proactive on this industry, we are confident in our innocence … We have a legal opinion and doctors licenses from [Affpower].

(Ex. S.)

Consistent with this message, Mr. Skurka's own notes from August 15, 2007, indicate that Mr. Jacobson is resolved to "fight the matter."  (Ex. U at 114.)   On August 27, 2007, Mr. Jacobson wrote to Mr. Skurka again, stating, "the more I read things, I simply believe that there is a huge misunderstanding from the DOJ. They are trying to put us into a conspiracy that simply DID NOT exist."  (Ex. T.)

On November 1, 2007, Mr. Jacobson wrote to Mr. Skurka setting out in great detail the reasons why he could not plead guilty.  (Ex. V.)  He concluded by stating his innocence in deeply personal terms:  "I have talked to my wife Lindi at length following our meeting yesterday and she is completely opposed to my pleading guilty to criminal charges for crimes *which I did not commit*.  I could not be her husband and a father if I did."  (*Id.* at 122 (emphasis added)).

Mr. Skurka's own notes are no different:

- On December 7, 2007, Mr. Skurka wrote, "client has made it clear he is prepared to fight the prosecution and contest the charges."  (Ex. U at 118.)
- On January 7, 2008, Mr. Skurka wrote that Mr. Jacobson is "adamant that he will not plead to money laundering charge as he is not guilty."  (*Id.* at 119.)
- On January 14, 2008, Mr. Skurka's notes state that "Client will <u>not</u> plea to felony charges of money laundering."  (*Id.* at 120.)

### 3.    Mr. Jacobson Is Unduly Pressured to Plead Guilty

Soon after obtaining the indictment, the government began putting pressure on Mr. Skurka to secure a guilty plea from Mr. Jacobson.  The government refused,

Cooley LLP
Attorneys At Law
San Diego

however, to provide discovery until Mr. Jacobson submitted to the Court's jurisdiction in the United States. (Ex. U at 116.)  Other lawyers on the defense team urged Mr. Skurka to obtain discovery from the government in order to confirm that the government could meet its burden of proof on each element. (*See, e.g.,* Ex. W (Holmes Memorandum) and Ex. X at 140 (interlineated draft plea agreement advising "Nathan should not plead to anything until we are shown the government's evidence for this.").)  Mr. Skurka did not follow this advice.  At least one of the lawyers urging this course, David Elden, was later removed from the team at Mr. Skurka's instigation. (Jacobson Decl. ¶ 29.)

Ultimately, the government presented cursory evidence to Mr. Skurka, including a snippet of the tape-recording in which Mr. Jacobson alludes to "virtual prescriptions."  The government also mentioned Mr. Jacobson's two visits to Costa Rica, implying incorrectly that Mr. Jacobson obtained intimate knowledge of Affpower's illegal operations while there. (Ex. U at 115.)  Apparently no other discovery was provided.

To further persuade Mr. Jacobson to plead guilty, the government claimed that he could be convicted of "strict liability offenses" without having to prove *mens rea.* (*Id.*)  The government advanced this theory to Mr. Skurka in August 2007 and again in early November 2007, as reflected in Mr. Skurka's notes stating that "for strict liability offences 40% of prescriptions were prepared (Affpower) from someone impersonating a doctor and can now prove that; knowledge not required; conviction a certainty on this count no doctor involvement at all." (*Id.* at 117.)  The government fancifully insisted to Mr. Skurka that because there were hundreds of such counts, Mr. Jacobson could face a hundred-year sentence without any proof of *mens rea.* (*Id.* at 115.)  To avoid this imaginary outcome, Mr. Skurka told Mr. Jacobson again that he should plead guilty to money laundering and cooperate with the government in order to obtain a more favorable sentence. (Jacobson Decl. ¶ 32.)  Mr. Skurka even told Mr. Jacobson that with a plea and

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

12.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

cooperation, he could receive probation and have his felony plea reduced to a misdemeanor. (*Id.*)

In mid-December 2007, the government gave Mr. Jacobson a deadline of January 14, 2008 to plead guilty to a felony. If he did not comply, the government would commence extradition proceedings. (Ex. U at 118.) Mr. Jacobson would not admit guilt and the deadline passed. On January 15, the government spoke to Mr. Skurka and again urged a plea, now claiming that Interpol would be notified and Mr. Jacobson's travel would be restricted if an agreement was not reached. Mr. Skurka's notes tell the story of the prosecutor's anger and threats: "[He] was quite angry ready to rock and roll feels played by client cynical about cooperation … We will get him. He will be forfeiting a lot more." (*Id.* at 120.)

Near midnight on January 15, Mr. Skurka met with Mr. Jacobson for over two hours to encourage a guilty plea. (Jacobson Decl. ¶ 32.) Mr. Skurka insisted that it was the only option available. (*Id.*) For Mr. Jacobson to maintain his innocence, according to Mr. Skurka, would lead not only to a longer sentence, but also to the destruction of his business and family. (*Id.* at ¶¶ 32-33.) Mr. Skurka advised that Mr. Jacobson would certainly be convicted and would face a prison sentence of 27 years if he proceeded to trial. (*Id.* at ¶ 32.) He neglected to tell Mr. Jacobson about the impact of *Booker* and its holding that the Sentencing Guidelines were advisory only. (*Id.*) Nor did he tell Mr. Jacobson that prison sentences for strict liability misdemeanors were rare. (*Id.*)

In his campaign to secure a guilty plea, Mr. Skurka also leveraged personal issues confronting Mr. Jacobson. At the time, Mr. Jacobson's wife had recently been hospitalized with a serious illness and was beginning a long recovery. (*Id.* at ¶ 33.) Mr. Jacobson was warned that an extended legal battle in the United States would likely result in grave medical consequences. (*Id.*) This could result in Mr. Jacobson's daughter ending up motherless with a father imprisoned in the United

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

13.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

States.  (*Id.*)  This terrified Mr. Jacobson, as his daughter had been a "street baby" in Kiev before her adoption.  (*Id.*)

Repeatedly, Mr. Jacobson was advised that the only realistic way to save his businesses and his family was to plead guilty.  (*Id.* at ¶ 34.)  Faced with enormous and unreasonable pressure to plead guilty from his lawyer, Mr. Jacobson finally relented.  (*Id.*)

### I.    Mr. Jacobson Enters A Guilty Plea

Mr. Skurka attended the plea hearing but could not appear for Mr. Jacobson because he was not admitted in this Court (or any other court in the United States). Mr. Jacobson's "local" counsel from Chicago, Ms. Holmes, did not even attend the plea hearing.  In her place she sent another lawyer, new to her firm, whom Mr. Jacobson had never met until that day.  (*Id.* at ¶ 35.)  That lawyer appeared with Mr. Jacobson before Judge Gonzalez.

As called for by the plea agreement, Mr. Jacobson pled guilty to one count of conspiracy to commit money laundering.  (ECF 263.)  Although Mr. Jacobson continued to believe in his innocence, he answered the questions posed by the Court during the plea colloquy based solely on the advice from Mr. Skurka that he had no other choice but to plead guilty.  (Jacobson Decl. at ¶ 36; *see supra* note 1.)

### J.    Mr. Jacobson Cooperates With the Government

The plea agreement was subsequently sealed to facilitate Mr. Jacobson's cooperation with U.S. authorities.  (ECF 257.)  Over the next four years, Mr. Jacobson provided detailed and important information on a variety of law enforcement and intelligence topics, many of them unrelated to the investigation that led to this indictment.  (Jacobson Decl. ¶ 37.)  He also paid $4.5 million to the government pursuant to his plea agreement.  (*Id.* at ¶ 38.)  He continued to abide by all conditions of his release.

### K.    Mr. Jacobson Is Abandoned by Counsel Prior to Sentencing

Around March 2011, Mr. Skurka began demanding additional fees from Mr.

Cooley LLP
Attorneys At Law
San Diego

14.

Memo ISO Motion to
Withdraw Guilty Plea
07-cr-2016-JLS

Jacobson.  (*Id.* at ¶ 39.)  Apparently dissatisfied with his client's response, and despite having already received almost $3 million, Mr. Skurka terminated his representation.  (*Id.*)  Mr. Jacobson was left only with his "local" counsel, Ms. Holmes of Chicago, with whom he had no meaningful attorney-client relationship.  (*Id.*)

Mr. Jacobson's sentencing date was ultimately set for July 30, 2012.  (ECF 1132.)  Confused by the process and abandoned by Mr. Skurka, Mr. Jacobson wrote directly to the Court and to the probation office.  (Jacobson Decl. ¶ 40.)  He acknowledged his upcoming sentencing date and expressed his desire "to provide full cooperation" with the Court.  (Ex. Y.)  He attempted to explain, however, that he could not attend his sentencing because he was scheduled to be in Asia for an important matter.  (*Id.*)  Most importantly, he informed the Court that he was innocent, and he stated his intention to withdraw his guilty plea.  (*Id.*)

Approximately two weeks before Mr. Jacobson's sentencing date, Ms. Holmes also withdrew from her representation of Mr. Jacobson, leaving Mr. Jacobson without counsel.  (ECF 1139.)  Following her withdrawal, she informed Mr. Jacobson that, in her view, probation was likely to be his sentence.[7]  (Ex. Z.)  Judge Gonzalez did not continue the hearing date, Mr. Jacobson did not appear, and the Court issued an arrest warrant.  (ECF 1142.)

When Mr. Jacobson learned of the arrest warrant from media accounts, he was on business travel in Myanmar.  (Jacobson Decl. ¶ 41.)  He immediately returned from a country that does not have an extradition treaty with the United States (Myanmar) to one that does (Canada).  (*Id.*)  He also retained the undersigned counsel.  (*Id.*)  Mr. Jacobson did not contest extradition.  (*See* ECF

---

[7] This defeats any suggestion by the government that Mr. Jacobson is motivated by "buyer's remorse" over the sentence he believed he would get versus the sentence ultimately imposed. Among other things, Mr. Jacobson claimed his innocence all along, and he plainly told Judge Gonzalez of his desire to withdraw his guilty plea at a time when Ms. Holmes was still telling him that "probation was inevitable."

Cooley LLP
Attorneys At Law
San Diego

15.

Memo ISO Motion to
Withdraw Guilty Plea
07-cr-2016-JLS

1168-1.)  On June 26, 2013, he voluntarily surrendered to Canadian authorities and was remanded into Canadian custody.  (*Id.*)  On July 24, 2013, Mr. Jacobson was brought to San Diego by the Marshals Service.[8]  (*Id.*)  He was held at MCC until he was released on bond on September 6, 2013.  (*Id.*)  He remains in San Diego ready to stand trial on the charges against him

## III.   LEGAL STANDARD

Federal Rule of Criminal Procedure 11(d)(2)(B) permits a defendant to withdraw his guilty plea before sentencing upon a showing of any "fair and just reason."  The Ninth Circuit applies this standard "generous[ly]" and "liberally." *United States v. McTiernan*, 546 F.3d 1160, 1167 (9th Cir. 2008); *United States v. Bonilla*, 637 F.3d 980, 983 (9th Cir. 2001). A motion to withdraw a plea pre-sentence should be "freely allowed."  *United States v. Davis*, 428 F.3d 802, 805 (9th Cir. 2005) (citing *United States v. Signori*, 844 F.2d 635, 637 (9th Cir. 1988)). The defendant does not have to prove that his plea is invalid in order to establish a fair and just reason for withdrawal before sentencing. *United States v. Mayweather*, 634 F.3d 498, 504 (9th Cir. 2010).

The Ninth Circuit has recognized that a showing of factual innocence may constitute a "fair and just reason" for withdrawal of a plea. *See United States v. Richards*, 1998 WL 667455, at *1 (9th Cir. Sept. 14, 1998).   Erroneous or inadequate legal advice may also provide a basis for withdrawal of a guilty plea. *McTiernan*, 546 F.3d at 1167; *United States. v. Showalter,* 569 F.3d 1150, 1158 (9th Cir. 2009).

## IV.   ARGUMENT

It is well documented that innocent people – Nathan Jacobson among them – sometimes plead guilty to crimes they did not commit.  *See*, *e.g.*, *United States v.*

---

[8] The full history of Mr. Jacobson's retention of new counsel, surrender to Canadian authorities, and voluntary return to the United States is set forth in Mr. Jacobson's Motion for Bail.  (ECF 1168.)

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

16.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

*Newbert*, 471 F. Supp. 2d 182, 195 (D. Me. 2007).   They make these tragic decisions for a variety of reasons.   In Mr. Jacobson's case, he believed he had no choice but to plead guilty because of pressure exerted on him by a Canadian lawyer biased against the United States justice system.   Federal Rule of Criminal Procedure 11(d)(2)(B) provides a means of correcting unjust convictions like Mr. Jacobson's before it is too late.   Because Mr. Jacobson is innocent, and only pleaded guilty because of ineffective assistance of counsel, he has a "fair and just reason" to withdraw his guilty plea.  Fed. R. Crim. P. 11(d)(2)(B).

### A.    Mr. Jacobson's Innocence Permits Withdrawal of His Plea

The Ninth Circuit has not announced a definitive standard for a defendant seeking relief under Rule 11(d)(2)(B) based on actual innocence.  It has stated that a defendant must provide more than a "mere assertion of innocence, absent a substantial supporting record." *United States v. Kroening*, 15 F.3d 1092 (9th Cir. 1993); *see also United States v. Ludwig*, 972 F. 2d 948, 951 (8th Cir. 1992); *United States v. Clark*, 931 F.2d 292, 295 (5th Cir. 1991).  The Ninth Circuit has also held that District Courts must apply Rule 11(d)(2)(B) "liberally," *McTiernan*, 546 F.3d at 1167, and another court has held that a defendant need only put forth some "objectively reasonable argument" that he is innocent.  *See United States v. Robinson*, 498 F. Supp. 2d 328, 336 (D.D.C. 2007).  Mr. Jacobson can easily make this showing.

Mr. Jacobson pleaded guilty to one count of money laundering in violation of 18 U.S.C. § 1956.  His conviction requires proof beyond a reasonable doubt that he: "(1) engaged in a financial transaction which involved proceeds from specified illegal activity, (2) knew the proceeds were from illegal activity, and (3) intended the transaction either to promote the illegal activity or to conceal the nature, source, or ownership of the illegal proceeds." *United States v. Marbella*, 73 F.3d 1508, 1514 (9th Cir. 1996).  Accordingly, as is often the case, Mr. Jacobson's conviction depends in large measure on his subjective state of mind – that he "***knew***" about the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

17.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

illegal activity and he "***intended***" to promote or conceal it. *Id.* (emphasis added). Because Mr. Jacobson has substantial evidence that he neither knew about nor intended to promote Affpower's illegal activities, his motion to withdraw should be granted.

### 1.    Mr. Jacobson Has Repeatedly Maintained His Innocence

The best evidence of Mr. Jacobson's subjective state of mind are his own statements. According to the files of Mr. Skurka, Mr. Jacobson consistently maintained his innocence. Several examples of these unambiguous statements are set forth above. (*See* Exs. R, S, T, and V.)

Mr. Jacobson repeated his protestations of innocence directly to the Court in June 2012, when he no longer had an attorney. He wrote then, "I wish to request leave of my guilty plea and wish to plead not guilty." (Ex. Y.) He maintains his innocence today: "I am innocent of the charges against me." (Jacobson Decl. ¶ 1.)

These consistent declarations of innocence constitute a fair and just reason for withdrawal of the plea. *United States v. Artabane*, 868 F. Supp. 76, 78 (M.D. Penn. 1994). In *Artabane*, the defendant consistently maintained his innocence, before abruptly changing his plea during trial. *Id.* The Court held:

> If we are to lend any credence to Defendant's assertions, and we should for the record plainly chronicles Defendant's reluctance to plead guilty, then we must recognize that the voluntary nature of Defendant's plea is questionable at best. If Defendant truly believed that he had but one option to being found guilty and that was to plead guilty, despite his continual assertion of innocence, then we must construe a "fair and just" reason from his assertions and actions.

*Id. See also United States v. Rogers*, 289 F. Supp. 726, 729 (D. Conn. 1968) (allowing withdrawal of plea where "Defendant not only maintained his innocence at the hearing on the instant motion and at the time of sentencing, but he did so consistently in conferences with his trial counsel both prior to and after his guilty plea.").

Cooley LLP
Attorneys At Law
San Diego

As explained in detail throughout this brief, Mr. Jacobson also "believed that he had but one option to being found guilty and that was to plead guilty." *Id.* Accordingly, he has a "fair and just" reason for withdrawing his guilty plea.

### 2. There Is Substantial Evidence to Support Mr. Jacobson's Innocence

Mr. Jacobson's repeated claims of innocence are neither unrealistic nor the wishful plea of a defendant in denial. His position is supported by extensive contemporaneous evidence that Mr. Jacobson conscientiously oversaw his companies with an emphasis on lawful operations. Indeed, Mr. Jacobson demonstrated a commitment to cleaning up the online pharmacy industry, not to exploit it. These actions buttress Mr. Jacobson's declarations of innocence, further demonstrating that he neither knew about nor intended to promote Affpower's illegal activities. *See United States v. Yarbrough*, 527 F.3d 1092, 1102-03 (10th Cir. 2008) (evidence of "law-abiding nature" is important evidence of defendant's lack of intent); *Michelson v. United States*, 335 U.S. 469, 476 (1948) (propensity evidence alone "may be enough to raise a reasonable doubt of guilt").

At the direction of Mr. Jacobson, Rx Payments was among the early participants in CIPA, an organization devoted to the highest standards of operations for Internet and mail-order pharmacies. Mr. Jacobson directed Rx Payments to use CIPA to help it identify reputable online pharmacies to solicit as clients. By doing so, Rx Payments was better able to avoid bad actors in the industry. Mr. Jacobson also used his influence in governmental and political circles to promote a clean Internet.

Unfortunately, Rx Payments' due diligence could not be perfect. Like all companies, it had to rely on the representations of its clients. And because pharmacies necessarily handle private health information, Rx Payments could not legally access the information it would need to ensure that each prescription was legal. Indeed, the government admits in the indictment that Affpower had a custom

Cooley LLP
Attorneys At Law
San Diego

19.

Memo ISO Motion to
Withdraw Guilty Plea
07-cr-2016-JLS

of concealing the illegal nature of its operations, and representing to third parties that its pharmacy practices "complied with all applicable state laws," and "met or exceeded all regulations governing prescription pharmaceutical sales." (ECF 1 at 4-5.) Mr. Jacobson certainly believed it, emphasizing in his recorded phone call with an Affpower employee (Mr. Glass) that the business should be "cleaner than clean."

This course of conduct is inconsistent with knowledge of or intent to promote Affpower's illegal activities. *See Yarbrough*, 527 F.3d at 1102; *Michelson*, 335 U.S. at 476. Rather, it shows that Mr. Jacobson held his own companies to the highest standards, and cooperated with law enforcement against rogue operators in the industry. At the very least, Mr. Jacobson deserves an opportunity for a jury to consider this evidence. *See* Fed. R. Evid. 404(a)(2). The Court should therefore grant his motion to withdraw his guilty plea. *See Newbert*, 471 F. Supp. at 199 (although defendant was competent to enter a guilty plea and did so knowingly, intelligently, and voluntarily, he was allowed to withdraw his plea where he presented evidence that he was actually innocent of the crime).

### B.    Mr. Jacobson Received Ineffective Assistance of Counsel

Mr. Jacobson pled guilty because Mr. Skurka advised him that he could not get a fair trial and would go to jail for decades if he did not "take the deal." In his June 2012 letter to the Court, Mr. Jacobson wrote: "I made the plea bargain based upon the strong influence of my lawyer, Mr. Steven Skurka and other counsel to both myself and my family. We were told in no unclear terms that I would never receive justice in the United States." (Ex. Y.)

Rather than being based on the application of professional judgment following an analysis of the facts and circumstances of the case, Mr. Skurka's advice was motivated by his well-documented belief in the basic unfairness of the "tilted" and "tyrannical" American justice system. For these reasons, Mr. Skurka provided ineffective assistance of counsel, which not only explains why Mr.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

20.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

Jacobson pled guilty, but provides an independent "fair and just" reason for the withdrawal of Mr. Jacobson's guilty plea.  Fed. R. Crim. P. 11(d)(2)(B).

A motion to withdraw based on the ineffective assistance of counsel should be granted if the defendant shows "that the advice he received from counsel was not within the range of competence demanded of attorneys in criminal cases."  *United States v. Hiett*, 220 Fed App'x 638, 639 (9th Cir. 2007).  There is no requirement that the defendant show actual prejudice because of the inadequate legal advice. *McTiernan*, 546 F.3d at 1167; *see also Davis*, 428 F.3d at 805-07 ("[A] defense counsel's erroneous advice may warrant withdrawing a plea even if the defendant does not prove that he would not have pleaded guilty but for the erroneous advice.") The defendant need only demonstrate that the proper legal advice of which he was deprived "could have at least plausibly motivated a reasonable person in the defendant's position not to have pled guilty." *Bonilla*, 637 F.3d at 983.

### 1.    Mr. Skurka Coerced Mr. Jacobson Into Pleading Guilty and Did Not Properly Advise Him of His Chances at Trial

Defense counsel must give professional advice, but cannot unduly influence a defendant's decision about whether to plead guilty.  *See* Model Rules of Prof'l Conduct R. 1.2 ("In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered").  Instead, defense counsel must explain all options available to the defendant and abide by the client's decision.  When this allocation of authority is not honored, and the lawyer exerts undue influence on the defendant's decision whether to plead guilty, the defendant has a fair and just reason to withdraw his guilty plea.  *See United States v. Mitchell*, 2009 WL 603198, at *2 (D. Utah March 9, 2009) (defendant demonstrated a fair and just reason to withdraw his guilty plea where counsel exerted undue pressure to plead guilty despite consistent assertions of innocence).

Mr. Skurka failed to honor his obligations by adamantly insisting that Mr. Jacobson plead guilty.  Time and again, despite Mr. Jacobson's declarations of

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

21.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

innocence and references to exculpatory evidence, Mr. Skurka counseled that a guilty plea was the only option, culminating in the midnight meeting on January 15, 2008. Mr. Skurka, ironically, professed to be an expert in United States law based on his long habit of criticizing the very system in which he now purported to serve Mr. Jacobson. This enabled him to unduly influence decisions that should have been made by Mr. Jacobson after consideration of all options. *See Mitchell*, 2009 WL 603198, at *2 (finding undue influence in part because of defendant's "general lack of understanding of the legal system"). Mr. Skurka abused this position by failing to provide reasonable advice about Mr. Jacobson's option to defend himself at trial. Our justice system demands more than that. *See Rogers*, 289 F. Supp. at 729 ("[I]t appears utterly unreasonable for counsel to recommend a guilty plea to a defendant without first cautioning him that, no matter what, he should not plead guilty unless he believed himself guilty.").

## 2.    Mr. Skurka Did Not Adequately Investigate Mr. Jacobson's Case or Obtain Discovery

Mr. Skurka's failure to consider anything but a guilty plea is magnified by his failure to obtain a proper foundation for making the recommendation. Defense counsel have an ethical and legal duty to investigate the facts of the case. *See United States v. Loughery*, 908 F.2d 1014, 1018 (D.C. Cir. 1990) (citing ABA Standards 4-3.8, 4-5.1(a)); *see also Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). In most instances, this requires that defense counsel request and obtain discovery from the government. Because Mr. Skurka did not adequately investigate the case or obtain discovery, he provided ineffective assistance of counsel that justifies the withdrawal of Mr. Jacobson's plea.

Under a far more demanding standard, the court in *United States v. Garcia-Espana* granted a *post-sentencing* motion to withdraw a guilty plea because the

Cooley LLP
Attorneys At Law
San Diego

22.

Memo ISO Motion to
Withdraw Guilty Plea
07-cr-2016-JLS

defendant received ineffective assistance of counsel.  2007 WL 473777, at *1 (E.D. Wash. Feb. 8, 2007).  Defense counsel's "representation fell below an objective standard of reasonableness when [he] failed to research or discuss the fact that [the defendant] had a possible defense to the . . . charge."  *Id.*  Like Mr. Jacobson, the defendant in *Garcia-Espana* was never given "any other legal option . . . other than to enter a guilty plea."  *Id.*

As in *Garcia-Espana*, Mr. Jacobson's counsel failed to adequately investigate Mr. Jacobson's possible defenses.  Mr. Skurka did not obtain discovery from the government despite his fellow counsel urging him to do so – discovery that would have indicated the best course was to defend the case at trial. *See Rogers*, 289 F. Supp. at 729 (holding that a recommendation to plead guilty "should not be made when the defendant in the past has maintained his innocence and has stated that he has two witnesses whom counsel has not attempted to interview.").

Unlike Mr. Skurka, undersigned counsel sought, received, and reviewed discovery from the government.  Other than non-controversial evidence that Mr. Jacobson was an owner of Rx Payments and Rx Payments provided credit card processing services to Affpower affiliates – information that Mr. Jacobson shared with federal agents himself – there is precious little about Mr. Jacobson, and certainly nothing that persuasively establishes his guilt.  Had Mr. Skurka performed his duties and obtained discovery, he too could have seen the weakness of the government's case.[9]

Mr. Skurka's failure to obtain discovery also deprived Mr. Jacobson of the ultimately favorable outcome enjoyed by those defendants who did go to trial.

---

[9] The government's case was not strong even against the defendants directly affiliated with Affpower.  In a trial against several of the other defendants indicted with Mr. Jacobson, the jury hung. (ECF 758.)  After Judge Gonzalez declared a mistrial, the defense and the Court learned of a significant Brady violation committed by the Washington, D.C. prosecutors (*see supra* note 6). (ECF 869 (government ordered to show cause why the case should not be dismissed for failure to comply with discovery obligations).)  Thereafter, numerous defendants accepted lenient plea agreements.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

23.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

After a mistrial was declared, and a serious Brady violation was uncovered, those defendants received lenient plea deals from the government.  (*See supra* note 9.) By asserting a client's Constitutional and statutory rights to discovery, competent defense counsel create an environment in which a defendant is entitled to benefit from the government's failure to meet its obligations.  Seven defendants in this case received that benefit; Mr. Skurka ensured that Mr. Jacobson could not.

Mr. Skurka's mishandling of the "strict liability offenses" further highlights his failure to adequately investigate the case.  Based on the indictment's allegations, it is not plausible that Mr. Jacobson could be convicted of any counts without proof of *mens rea*.  The only counts that could be "strict liability offenses" are the 21 counts alleging violations of 21 U.S.C. § 331(k) (distribution of misbranded drugs). The most fundamental research and investigation would have revealed to Mr. Skurka that Mr. Jacobson could only be convicted of these counts on a strict liability theory if he physically handled the drugs (or their packaging) at issue.  *See* 21 U.S.C. § 331(k).  But the indictment alleges that Mr. Jacobson's only connection to Affpower was as the owner of Rx Payments, which processed credit card payments for Affpower.  (ECF 1, ¶ 6(h).)   Because he did not handle the drugs at issue, Mr. Jacobson's conviction for these counts would have to rest on another basis, such as aiding and abetting or conspiracy, that would require proof of *mens rea*.  Mr. Skurka failed to conduct this basic research and investigation, and instead parroted the government's implausible arguments and threats to Mr. Jacobson. More is demanded from effective counsel.

### 3. Mr. Skurka's Advice to Plead Guilty Was Based on His Bias Against the United States Justice System

We know that Mr. Skurka's recommendation to plead guilty was not based on an adequate analysis of the evidence against Mr. Jacobson.  Mr. Skurka was instead preoccupied with his opinion that "prosecutors just don't lose" and defendants are left to barter for justice "in the prosecutor's office, not . . . the

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

24.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS

courtroom."  It is no wonder that Mr. Skurka advised Mr. Jacobson to plead guilty despite Mr. Jacobson's protestations of innocence.

But in doing so, Mr. Skurka did not provide the "competent representation" to which Mr. Jacobson was entitled.  Model R. Prof'l Conduct 1.1.  It cannot be effective assistance of counsel to recommend a guilty plea regardless of a defendant's factual innocence and with little to no knowledge of the evidence against him.  Rather than provide "the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation" of Mr. Jacobson, Mr. Skurka took a shortcut.  *Id.*  This deprived Mr. Jacobson of his chance to test the government's proof at trial, and led an innocent man to plead guilty.

## V.   CONCLUSION

For the foregoing reasons, Mr. Jacobson respectfully requests that the Court grant his motion to withdraw his guilty plea. He also requests an evidentiary hearing on this motion.

Dated: December 20, 2013

COOLEY LLP
MICHAEL A. ATTANASIO (151529)
JON F. CIESLAK (268951)


*/s/ Michael A. Attanasio*
Michael A. Attanasio (151529)


MICHAEL GORDNER LAW OFFICE PLC


*/s/ Michael Gordner*
Michael Gordner (pro hac vice)

Attorneys for Defendant
Nathan Jacobson

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

25.

MEMO ISO MOTION TO
WITHDRAW GUILTY PLEA
07-CR-2016-JLS